*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 11, 2021

Plaintiff-Appellee,

v

No. 350215
Calhoun Circuit Court
LC No. 2018-003495-FH

DEVREE AHMONNE GARNER,

Defendant-Appellant.

Before: TUKEL, P.J., and JANSEN and CAMERON, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of possession with intent to deliver a controlled substance (heroin/fentanyl) in an amount over 50 grams, MCL 333.7401(2)(a)(*iv*), and possession with intent to delivery a controlled substance (cocaine) in an amount over 50 grams, MCL 333.7401(2)(a)(*iv*). Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to 5 to 40 years' imprisonment for each conviction, to be served consecutively. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a drug sale between defendant an undercover police officer. Kalamazoo County Sheriff's Deputy Lyle McGrath, who was assigned to the Michigan State Police Southwest Enforcement Team as an undercover narcotics detective, testified that a confidential informant had told him that a person named "D" sold narcotics in the Battle Creek area and gave McGrath "D's" phone number. On November 27, 2018, McGrath contacted defendant by calling (269) XXX-5947 and asked to buy $40 worth of heroin. Defendant told him to go to a location at an apartment complex. However, on the way McGrath was contacted and the "meet" location was changed by defendant to a Dixie Mart parking lot at 318 Emmett Street in Battle Creek. Battle Creek Police Corporal Mikael Ziegler, who was working with Detective McGrath to assist with the undercover drug buy, assembled and photographed the $40 that was to be used for the buy. After McGrath made the call to set up the buy on his own cell phone, Ziegler served on the surveillance team, along with Calhoun County Sheriff's Deputy Tyler Paesens, who was also assigned to the Southwest Enforcement Team.

McGrath parked in the lot at 318 East Emmett Street and observed defendant walk out of the Dixie Mart; defendant then approached his vehicle, McGrath gave defendant $40, and defendant gave McGrath a small baggie of narcotics. McGrath placed the narcotics baggie into an evidence bag and turned it over to Ziegler. Ziegler testified that he observed a hand-to-hand transaction take place, after which defendant got back into his car and drove away.

McGrath subsequently contacted defendant at the same telephone number on December 4, 2018 and arranged another $40 heroin drug buy. Ziegler also worked with McGrath to set up this buy and conducted surveillance. On this occasion, McGrath drove to Sam's Supermarket at 862 North Avenue in Battle Creek, parked next to the building, and sent a text message "Here" to defendant. McGrath and Ziegler then observed defendant accompanied by a man later identified as Ehab Kelly. As the two men walked toward the store, Ziegler observed defendant pass something to Kelly, who then secreted this object in his left jacket pocket. Kelly continued toward McGrath's car while defendant remained behind, looking up and down the street in a manner Ziegler termed a "counter-surveillance technique" used by people "selling narcotics in tandem or as a team." Kelly proceeded to McGrath's car with his hand in his left jacket pocket, dropped a baggie on the front seat through the passenger window, and received money from McGrath; Kelly then left and rejoined defendant, and the two of them entered the store. McGrath again placed the drug baggie in an evidence envelope and later turned it over to Ziegler. Ziegler made a video recording of the transaction from the surveillance car, and was also able to take photographs of defendant and Kelly as they left the store and returned to defendant's home. The video and photographs were entered into evidence and shown to the jury.

On December 6, 2018, McGrath contacted defendant at the same telephone number to set up a third drug buy for $40 of heroin. Ziegler again assisted McGrath by providing the recorded money for the buy and with the subsequent execution of a search warrant at defendant's residence. McGrath was initially told by defendant to go to the Sam's Supermarket again, however defendant told McGrath to drive down Coolidge Street where he would see defendant and could pick him up; McGrath did so at the corner of Coolidge and Redner. Defendant directed McGrath to drive, and, as they drove, defendant kept looking around, which made McGrath nervous. Defendant told McGrath to pull into a driveway, and when McGrath did so, defendant got out of the car and told McGrath to drive around the block; defendant then walked into the house.

When McGrath returned from his trip around the block, he saw defendant walking down Redner. While he sat for about 10 minutes waiting for defendant to return, and while he tried calling defendant—who did not respond—Kelly approached his window and asked him what he was doing. When McGrath explained that defendant told him to wait, Kelly handed him a small package, so McGrath handed him the money and Kelly walked away; McGrath then drove away. McGrath inspected the package and observed that it did not look like the substances he had previously received; subsequent testing determined that the substance was not narcotics.

Battle Creek Police Detective Carl Vandyke, who was assigned to the Special Investigations Unit, testified that on December 6, 2018, he was the lead officer of an Emergency Response Team (ERT) that he drove in a van to a residence at 261 Redner Avenue in Battle Creek with the intention of conducting surveillance while an undercover drug buy was conducted by Detective McGrath. However, it was cold and snowy that day and the roads were covered with packed snow and were slippery. As he was making his way to the location, Detective Vandyke

received word that the undercover narcotics transaction had taken place and that the suspect, defendant, was outside the residence; Vandyke decided to execute the search warrant and arrest defendant.

Corporal Ziegler was also in the ERT van. He testified that as the van approached the residence, he saw defendant standing at the end of his driveway; defendant saw the van and then turned and ran back to the garage. When the van came to a stop, Ziegler followed defendant into the detached one-car garage, accompanied by Sergeant Christof Klein. The overhead garage door was closed, so they entered through a side door. A vehicle was parked inside, so there was not much free space. Klein testified that when he entered, he announced, "Police" "Search Warrant," and a man's voice called out, "I'm over here on the ground." They discovered defendant partially underneath the vehicle, stood him up and placed him in handcuffs, and took him out of the garage; he did not resist them.

Corporal Andrew Olsen worked in the Battle Creek Police Department forensic unit and participated in the execution of the search warrant. He testified that he followed the ERT officers into the garage and observed defendant on the ground; Olsen assisted in handcuffing defendant and leading him out of the garage. On the ground where defendant had been, the police found defendant's cell phone and some ripped plastic baggies. Olsen checked defendant's pockets and discovered a digital scale in his left front pocket, two plastic baggies containing a white chunky substance (cocaine) and some tan rock-like substances in his sweatshirt pocket (heroin/fentanyl). It was the possession of these two substances that gave rise to the drug charges at issue.

Defendant was tried by a jury and was convicted and sentenced as noted *supra*. This appeal followed.

## II. OTHER-ACTS EVIDENCE

Defendant first argues on appeal that the trial court erred by admitting other-acts evidence related to defendant's prior drug dealing. We disagree.

A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). However, whether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo. *Id*. A trial court necessarily abuses it discretion when it admits evidence that is inadmissible as a matter of law. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

When we find error in the admission of evidence, a preserved nonconstitutional error "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative— i.e., that it undermined the reliability of the verdict." *People v Douglas*, 496 Mich 557, 565-566; 852 NW2d 587 (2014) (quotation marks and citations omitted); *Lukity*, 460 Mich at 495-496. This inquiry "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *Lukity*, 460 Mich at 495 (quotation marks and citations omitted). "In other words, the effect of the error is evaluated by assessing it in the context of the untainted

evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Id.* [*People v Denson*, 500 Mich 385, 396-397; 902 NW2d 306 (2017) (footnote omitted).]

MRE 404(b)(1) concerns the admission of other-acts evidence and provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrong, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), our Supreme Court held that the propriety of admitting other-acts evidence must be evaluated as follows:

First, [] the evidence [must] be offered for a proper purpose under Rule 404(b); second, [] it [must] be relevant under Rule 402 as enforced through Rule 104(b); third, [] the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, [] the trial court may, upon request, provide a limiting instruction to the jury. [Footnote omitted.]

In this case, Detective McGrath set up the heroin buy on December 6, 2018. Defendant directed McGrath to Sam's Supermarket and then redirected him to a residential street where McGrath let defendant get in his car. Defendant directed McGrath to pull into a driveway, directed him to drive around the block, and got out of the car. McGrath drove around the block and then pulled to the side of the street and tried to contact defendant. After a few minutes, Kelly approached and asked McGrath what he was doing. When McGrath explained he was waiting for defendant, Kelly handed him a baggie containing a substance and McGrath then drove away. The substance was subsequently determined not to be narcotics. Defendant was arrested when a search warrant was subsequently executed at the residence associated with defendant. A digital scale and two baggies of narcotics were found on defendant's person. Laboratory reports indicated that the narcotics were cocaine and heroin/fentanyl. The amount of narcotics on defendant's person was consistent with sale and not personal use; additionally, defendant claimed he was not a user. Defendant was charged with possession with intent to deliver heroin/fentanyl and possession with intent to deliver cocaine.

Since defendant did not personally transfer anything to McGrath, and the material given to McGrath by a third party was not narcotics, the prosecution was concerned that defendant might argue that he was not guilty of this offense because he had not given anything to McGrath and even if he could be connected with Kelly, the substance transferred was not narcotics. Hence, the defense might argue that the prosecution had failed to prove beyond a reasonable doubt that defendant possessed the narcotics subsequently discovered on his person with the intent to deliver

them, and that the prosecution could only prove that Kelly, who had no apparent connection with defendant, had actually tried to deliver anything to McGrath on December 6, 2018.

However, evidence of the previous two drug deliveries that McGrath had from defendant cast the charged offenses in a different light because it helped establish both defendant's intent to deliver narcotics and his scheme, plan, or system for doing so. Accordingly, the other-acts evidence was offered for a proper purpose under MRE 404(b)(1).

In the first delivery on November 27, 2018, McGrath called defendant asking to buy $40 worth of heroin. Defendant directed McGrath to an apartment and then redirected him to a local Dixie Mart. Once there, defendant approached McGrath's car, obtained $40 from him, and gave McGrath a baggie of what proved to be heroin.

On December 4, 2018, McGrath again contacted defendant via phone and asked to buy $40 of heroin. Defendant directed McGrath to go to Sam's Supermarket. Defendant was observed walking to the location with Kelly. Defendant passed something to Kelly, who then walked to McGrath's car, got $40 from McGrath, and gave him a baggie of heroin.

On each of these three occasions, McGrath contacted defendant at the same telephone number; the cell phone discovered near where defendant was arrested had this number. On both the first and the third occasions, defendant redirected McGrath to a new location before completing the sale at the new location. On both the second and the third occasions, Kelly made the actual transfer of narcotics (or fake narcotics), but the sales had been initiated with defendant and he was in the immediate area when both transfers were made. Defendant's practice of twice changing the location, as well as his use of Kelly as an intermediary on two occasions, demonstrated his scheme, plan, or system of delivering narcotics while attempting to protect himself from the police. At the second delivery, the backup team observed defendant surveilling the scene while using someone else to make the actual transfer; at the third transfer, defendant was outside his residence communicating with someone on his cell phone when Kelly made the transfer on a nearby street. On the first two occasions, heroin was sold to McGrath; on the third occasion, the transfer was accomplished in the same manner, but fake narcotics were used, perhaps because defendant had become suspicious of McGrath. But the transfer of real narcotics on the first two occasions provided evidence that defendant's intent was to deliver the narcotics found on his person; presumably, he wanted to see McGrath's reaction to receiving fake narcotics before he sold anything more to him.

When the charged offenses are considered in light of these two previous transactions, a clear inference arises that defendant's possession of illegal narcotics on December 6, 2018 was with the intent to deliver. The manner in which defendant accomplished the deliveries in the first two instances, on November 27 and December 4, established his scheme, plan, or system, and established his intent to deliver with respect to the narcotics he possessed on December 6. The other-acts evidence thus had the tendency to make it more probable that defendant intended to deliver narcotics to McGrath (or, indeed, to other people) on December 6—even though the actual

substance delivered to McGrath on that occasion was fake. Therefore, the other-acts evidence was relevant under MRE 401,[1] and thus was admissible under MRE 402.[2]

The third consideration is whether the probative value of the evidence is *substantially* outweighed by the danger of unfair prejudice. *VanderVliet*, 444 Mich at 55. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). In this case, the evidence that defendant conducted two prior drug transactions in which he sold heroin to McGrath was significantly probative because it showed that defendant was contacted at the same telephone number, that he conducted the drug transactions (once directly and the second time by an intermediary), and that he actually handed over illegal narcotics (again—once directly and then through an intermediary). The charged offense again showed defendant being contacted at the same telephone number as used previously, defendant directing McGrath where to go to conduct the transactions, and strong circumstantial evidence that defendant used Kelly as an intermediary to conduct an actual transfer. The probative value of this other-acts evidence was significant and it was not substantially outweighed by the danger of unfair prejudice.

Finally, both the prosecution and the defense, in their closing arguments, and the trial court in its instructions, specifically made clear to jurors that their decision had to be based on the evidence with respect to the December 6th transaction, and that the prior drug sales could only be used to determine defendant's intent or his scheme, plan, or system in committing the offense. Then, the trial court specifically instructed the jury:

> Now, folks, you have heard evidence that was introduced to show that the defendant committed crimes for which he is not on trial. Specifically, I'm referring to the allegations that crimes took place on November 27th, 2018 and December 4th, 2018. If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant, specifically, meant to deliver to another person the substances located on December 6th, 2018 and/or whether the defendant used a planned system or characteristic scheme that he has used before or since.
>
> You must not consider this evidence for any other purpose. For example, you must not decide that it shows the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All of the evidence must convince you, beyond a

---

[1] MRE 401 provides: "'r e l e v a n t evidence' means evidence having any tendency to make the existence of any fact that is of consequences to the determination of the action more probable or less probable than it would be without the evidence."

[2] MRE 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court. Evidence which is not relevant is not admissible."

reasonable doubt, that the defendant committed the alleged crime, or you must find him not guilty.

"Jurors are presumed to follow the court's instructions, and instructions are presumed to cure most errors." *People v Mullins*, 322 Mich App 151, 173; 911 NW2d 201 (2017), citing *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Given the trial court's clear instructions, as well as the admonitions of the prosecutor and the defense, it is not probable that the jury ignored the court's instructions and convicted defendant based on the prior drug buys. Support for this conclusion is the fact that the jurors found defendant not guilty of the two firearm charges despite significant evidence that circumstantially indicated that defendant constructively possessed a firearm when he was arrested.

In sum, we conclude that the other-acts evidence was properly admitted at trial to establish defendant's intent as well as his scheme, plan, or system in selling illegal drugs to assist the jury in determining if the illegal drugs he possessed on December 6, 2018 were possessed with the intention to deliver.

## III. DRUG PROFILE TESTIMONY

Second, defendant argues that the prosecution improperly presented drug profile testimony at trial by way of expert witness testimony, and that defense counsel was ineffective for failing to object. We disagree.

Defendant did not object to the expert witness testimony he now challenges. Therefore, this issue is not preserved, *People v Schrauben*, 314 Mich App 181, 191; 886 NW2d 173 (2016), and this Court reviews this issue for plain error. *People v Cain*, 498 Mich 108, 116; 869 NW2d 829 (2015). Defendant did raise his claim of ineffective assistance in a motion to remand, however, that motion was denied by this Court. See *People v Garner*, unpublished order of the Court of Appeals, entered June 22, 2020 (Docket No. 350215). Thus, this Court's review is limited to mistakes apparent on the record. *People v Dunigan*, 299 Mich App 579, 586; 831 NW2d 243 (2013).

"Drug profile evidence has been described as an informal compilation of characteristics often displayed by those trafficking in drugs." *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999) (citation and quotation marks omitted). A drug profile is an investigative technique: "nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity." *Id*. Drug profile evidence is "inherently prejudicial" because "it may suggest that innocuous events indicate criminal activity." *Id*. at 53. "Generally, the admission of this evidence is nothing more than the introduction of the investigative techniques utilized by law enforcement officers in investigating criminal activity." *People v Hubbard*, 209 Mich App 234, 240; 530 NW2d 130 (1995). "In other words, these characteristics may not necessarily be connected to or inherently part of the drug trade, so that these characteristics could apply equally to innocent individuals as well as to drug dealers." *Murray*, 234 Mich App at 52. Drug profile testimony is not admissible as substantive evidence given its limited relevance; rather, it is admissible for limited purposes. For example, to explain

why a defendant was stopped or to rebut exculpatory testimony given by a defendant. *Hubbard*, 209 Mich App at 242.

On appeal, defendant complains that

[t]he drug profile testimony was prominent in the prosecution's case-in-chief and provided the testimony necessary to conclude [defendant] intended to distribute the narcotics that were found after his arrest. Further, the prosecution heavily relied on this testimony in their closing argument to support a finding of guilt. Through presenting this testimony, the prosecution supplanted the jury's role of determining guilt or innocence and let Detective McGrath and others take their place.

Defendant's argument suggests that the mere presentation of drug profile evidence automatically caused error. However, we conclude that after a close examination of the evidence presented in this case, the drug profile evidence defendant complains of was properly admitted.

First, defendant does not challenge that two of the police officers were properly qualified as experts in drug trafficking. Deputy McGrath was so qualified, and then testified about a number of things that were common in the sale of illegal narcotics. These included: the use of cash for sales, the use of multiple cell phones, distinctive packaging of the narcotics and the packing of different amounts so as to be ready for quick sales, not keeping large amounts of narcotics on hand, the normal price of basic amounts of heroin in the Battle Creek area, the use of scales to weigh the drugs in preparation for sale, the use of confidential informants by police to locate sellers, and the similar application of these factors to the sale of cocaine. McGrath also testified that, sometimes, drug dealers use a go-between to actually deliver the drugs as a means of evading or hiding what they are doing, and might deliver fake drugs so as to make money while not turning over anything of value or to determine if the buyer is a police officer. On cross-examination, McGrath testified that he did not think defendant was selling him fake drugs as a test in this case because defendant had previously sold him real narcotics and "usually those tests are in the beginning." Thus, to the extent McGrath offered drug profile evidence, defendant's counsel chose to deal with the issue through cross-examination. On redirect examination, McGrath agreed that he had previously encountered those who were nervous and did not want to sell him narcotics, and he acknowledged that defendant was "nervous and aware of his surroundings" during his contact with defendant on December 6.

Detective Sutherland was also qualified as an expert in drug trafficking. Defendant objected that Sutherland had not been listed as an expert witness on the prosecution's pretrial notice, but otherwise had no objection. The trial court determined that the need for his expert testimony had come up during the trial, that a proper foundation had been laid by the prosecution regarding his qualification, and that the fact he had been involved in narcotics investigations was not a surprise to the defense. Sutherland then testified that drug dealers required scales to weigh the amount of drugs they were selling and baggies to package the drugs for sale; that they frequently utilized multiple cell phones—one for drug sales and one for personal use; that they kept the money separate from their person so that it would not be seized if arrested; that they sometimes use a partner to deliver the drugs; that they often do not keep drugs in the house where they live; that they use plastic baggies to deliver drugs and sometimes rip the baggies to throw the

drugs away if they are in danger of being arrested; that a dealer will typically have multiple doses of drugs, while a user will not; and that it was typical in the Battle Creek area to mix heroin and fentanyl because the fentanyl was more powerful and cheaper so less of the more expensive heroin would have to be used to make up an equal weight of the dosage. He also testified, consistently with McGrath's testimony, that the typical sale would be $20 for .1 gram of heroin or $40 for .2 grams. He explained the typical sale price for cocaine and the number of doses of cocaine and heroin/fentanyl that would result from the amounts found on defendant's person. On cross-examination, defense counsel got Sutherland to admit that the sale price of cocaine or heroin/fentanyl might differ from one seller to another; that some users would use a digital scale to make sure they were receiving the amount paid for; and that it was possible for users to "buy in bulk."

Detective Vandyke, who was not qualified as an expert, testified that a lid to a digital scale was found in the kitchen. He stated:

> Inside the kitchen, above the stove, there was a cupboard with a lid that went to a digital scale. And a digital scale [is] commonly used for the, kind of, weighing and dividing of narcotics for sale. And that lid, had the residue of a white, powdery residue which was suspected to be cocaine. And—which is common with the distribution and sale of narcotics, that the—a larger portion is divided up on a scale and weighed to get a correct amount for sale and which will leave that powdery residue.

Defendant did not object to Vandyke's testimony. Moreover, Vandyke's brief testimony about the scale lid was simply repetitive of testimony that was given by McGrath and Sutherland, both of whom were qualified as experts. On cross-examination, defense counsel established that a digital scale had not been found in the house, and Vandyke admitted that some purchasers also use digital scales. It is also noteworthy that defense counsel asked Vandyke:

> What about—what about packaging materials, specifically, individual, little, plastic bags that could have quantities dropped off in and have the corners knotted off and torn off? Did you find—did you find that type of material in that bedroom?

Thus, it appears that defense counsel was using Vandyke as an expert in drug trafficking to offer opinion testimony that would potentially be helpful to establish that defendant was *not* involved in selling illegal narcotics, but might instead simply have been a user.

Finally, defendant takes issue with Corporal Ziegler's testimony that defendant's behavior in looking up and down the street during the December 4th delivery was a "counter-surveillance technique" used by people "selling narcotics in tandem or as a team." There was no defense objection to this testimony. While this testimony was arguably presented as drug profile testimony, in reality testimony that one member of a multiparty illegal operation served as a lookout is not, strictly speaking, drug profile testimony since it would be applicable to any criminal transaction. Moreover, McGrath had already testified that it was not unusual for a drug seller to employ an intermediary to make the actual delivery.

Based on our review of the record in this case, it is clear to this Court that the drug profile evidence was presented to "to assist the jury as background or modus operandi explanation." For example, the testimony explained that digital scales were used in drug transactions to weigh drugs for sale—and also used by buyers to make sure they were provided the amount of drugs they had paid for. The testimony also explained that knotted plastic baggies were used to package drugs, that heroin/fentanyl was typically sold in the Battle Creek area in $20 amounts, that drug dealers frequently used multiple cell phones, that intermediaries are often used to remove the drug dealer from the actual act of handing over the purchased drugs, and so on.

Moreover, the prosecution did not rely solely on this evidence to establish defendant's guilt. When defendant was arrested, he had two baggies, one containing heroin/fentanyl and the other cocaine. The amounts in these bags were sufficient to total 22 to 28 doses of heroin/fentanyl and eight doses of cocaine. Defendant denied that he was a drug user. Defendant possessed a digital scale on his person. McGrath contacted defendant directly to arrange the sale of heroin and he did so by calling the cell phone that was found on the ground next to defendant when he was arrested. Evidence of drugs was found in the house in which defendant admitted he lived (and in the bedroom containing correspondence addressed to defendant, defendant's birth certificate, and clothes that were appropriately sized for defendant—but not for the other residents in the house). Defendant clearly possessed illegal controlled substances, and these facts proved beyond a reasonable doubt that he did so with the intent to deliver them. The drug profile evidence merely explained defendant's modus operandi in accomplishing those deliveries.

The trial court also properly instructed the jury regarding the limited purpose of the drug profile testimony. Specifically, the trial court stated:

> You have heard testimony from expert witnesses who have given you their opinions in the areas in which they are experts on. These include Andrew Olsen, who testified as an expert in the analysis of latent prints, and Lyle McGrath and Tyler Sutherland, who testified as experts in drug trafficking.
>
> Experts are allowed to give opinions in court about matters that they are experts on. However, you do not have to believe an expert's opinion. Instead, you should decide whether you believe it and how important you think it is. When you decide whether you believe an expert's opinion, think carefully about the reasons and facts that he gave for his opinion and whether those facts are true. You should also think about the expert's qualifications and whether his opinion makes sense when you think about all of the other evidence in the case.

The trial court continued:

> Now folks, you have heard evidence that was introduced to show that the defendant committed crimes for which he is not on trial. Specifically, I'm referring to the allegations that crimes took place on November 27th, 2018 and December 4th, 2018. If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant, specifically, meant to deliver to another person the

-10-

substances located on December 6th, 2018 and/or whether the defendant used a planned system or characteristic scheme that he has used before or since.

> You must not consider this evidence for any other purpose. For example, you must not decide that it shows the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All of the evidence must convince you, beyond a reasonable doubt, that the defendant committed the alleged crime, or you must find him not guilty.

> You have heard testimony from Lyle McGrath and Tyler Sutherland about their training or experience concerning other drug cases. This testimony is not to be used to determine whether the defendant committed the crime charged in this case. This testimony may be considered by you only for the purpose of understanding how the police investigated the charged offenses and how they obtain evidence of drug delivery.

We conclude that the trial court's instructions were sufficient to "adequately limit[ ] the use of the profile evidence as a whole." *Murray*, 234 Mich at 61.

Finally, we note that the neither the expert witnesses nor the prosecutor opined that defendant was guilty of the charged offenses because of the drug profile testimony. See *Murray*, 234 Mich App at 57, where this Court concluded "the expert witness should not express his opinion, based on a profile, that the defendant is guilty, nor should he expressly compare the defendant's characteristics to the profile in such a way that guilt is necessarily implied." The witnesses and the prosecutor in this case emphasized defendant's possession of sizable amounts of illegal narcotics on his person when he was arrested and used the profile information merely to explain why defendant's behavior on December 6th was consistent with the intent to deliver narcotics, even though the substance delivered to McGrath on that day was not an illegal narcotic. Indeed, the drug profile evidence was "an explanation of the evidence[,]" and its admission was not improper. *Id*. at 62.

Defendant also argues that defense counsel was ineffective for failing to object to the admission of the drug profile testimony. However, as discussed, the admission of this evidence was proper, and therefore any objection would have been futile. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## IV. CUMULATIVE ERROR

Third, defendant argues that if neither of his first two claims of error were individually sufficient to warrant reversal of his convictions, the cumulative effect of these errors denied him his right to a fair trial. We disagree.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial will

be granted. Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007) (citations omitted).

As discussed *supra*, there was no error in the trial court's admission of other-acts evidence or in the prosecution's presentation or use of drug profile testimony. "Because no errors were found with regard to any of the above issues, a cumulative effect of errors is incapable of being found." *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999).

## V. SENTENCING ERRORS

Defendant raises two challenges to his sentence: that the trial court impermissibly considered acquitted conduct at sentencing, and that the trial court erroneously scored offense variable (OV) 14 and OV 19. We address each in turn.

## A. CONSIDERATION OF ACQUITTED CONDUCT

Defendant first argues that the trial court impermissibly considered acquitted conduct when fashioning his sentence. We disagree.

Defendant failed to raise this issue in the trial court. Therefore, this Court's review is limited to plain error affecting a defendant's substantial rights. *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines¸*460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted).

Our Supreme Court, in *People v Beck*, 504 Mich 605, 629; 939 NW2d 213 (2019), held "that due process bars sentencing courts from finding by a preponderance of the evidence that a defendant engaged in conduct of which he was acquitted." Indeed, "once acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime." *Id*. at 609. However, our Supreme Court in *Beck* acknowledged: "When a jury has made no findings (as with uncharged conduct, for example), no constitutional impediment prevents a sentencing court from punishing the defendant as if he engaged in that conduct using a preponderance-of-the-evidence standard." *Id*. at 626.

In this case, defendant was convicted of two counts of possession with intent to deliver a controlled substance, but was acquitted of two charges related to the handgun discovered during the search of the garage where defendant was attempting to hide: felon-in-possession and felony-firearm. The trial court sentenced defendant within the minimum sentencing guidelines range, but imposed consecutive sentences. To be clear, the trial court did not refer at sentencing to either of the acquitted charges.

In explaining its sentencing decision, the trial court reviewed defendant's prior criminal record. According to the Presentence Information Report (PSIR), defendant had five prior felony convictions and 20 prior misdemeanor convictions. The trial court stated that there were "numerous factors that go into my decision to sentence you," and began by noting that "[t]he fact of the matter is, you have been involved with the criminal justice system since you were a juvenile," including ten juvenile petitions, encompassing charges such as first-degree home invasion and assaultive charges. The court then reviewed defendant's lengthy adult criminal history that included "many misdemeanors" and five felonies. Defendant had had probation for a fleeing and eluding conviction revoked because of threatening behavior, and similarly, defendant's probation for a conviction of carrying a concealed weapon was later revoked and defendant was sentenced to prison. When defendant was paroled he subsequently returned to prison for rule violations, then paroled again, then again returned for rule violations, and was ultimately returned to prison where he served his maximum sentence. The court noted that defendant was convicted of felon-in-possession of a firearm and given five years' probation, but that he was ultimately discharged "without improvement"; the court added: "I think without improvement is important in terms of this record."

Defendant focuses his argument on the fact that in evaluating the PSIR, the trial court listed on the record charges that had been dismissed, including charges that were dismissed as a part of plea agreements, charges to which defendant had pleaded guilty, or had otherwise been convicted—leading up to the charges of which he was convicted in this case. However, defendant ignores the trial court's summation:

> Added to that record, and I'll note that you have been charged with a number of things that have been either dismissed or for which you have been found not guilty by a jury, but that doesn't change the fact that you're [sic] contacts with the criminal justice system are long. They are ongoing. There has really been no period of time, other than when you were in prison, when you weren't being charged with criminal offenses. And a large number of those include the possession or the distribution of narcotics.

> The [PSIR] indicates that you last worked in 2003 and I think that that's fairly consistent with the fact that that appears to be when you started selling narcotics as a job. And the fact of the matter is, Mr. Garner, you are a bright man. I think your attorney is accurate. You are educated. You have your high school diploma. You're probably capable of much more than what this paper or this packet indicates to me, but it appears to the Court that you have, since you've been an adult, taken the easy way out.

> You've not worked since 2003. You have, on the other hand, had all of these charges and convictions related to controlled substances. So, I have to assume that that is your business. When I look at the facts of this particular offense for which you are before the Court, specifically 2018-3495-FH, I would note that you had both cocaine and fentanyl. I am particularly concerned about the fentanyl. That is a[n] exceptionally dangerous substance that may increase the profit of someone selling, but it also increases the mortality rate of the persons using. And that has been a significant problem in our community.

-13-

You had those two controlled substances on you. You drew another person into, what I believe to be, your business, Mr. Kelly. And given those facts, I do think that it is appropriate to run count one and count two consecutive in 2018-3495-FH.

* * *

And I know, for the record, that I put reasons on the record that I believe justify running counts one and two consecutive. In 2018-3495-FH, I had considered simply exceeding the guidelines, but it is this Court's opinion, based upon your history and the fact that I believed that you are engaged in a fairly significant enterprise of drug trafficking in our community, and the fact that you pulled someone else into your enterprise, as it relates to the trial testimony in that case, that the consecutive sentence is appropriate.

Indeed, the trial court made no reference to the two charges of which defendant was acquitted in this case, nor did address the evidence related to any of the previous acquittals or dismissals in other unrelated cases. Rather, the trial court recited *all* of the crimes listed in defendant's PSIR to support its conclusion that defendant had chosen to pursue a life of crime, and then, based on that determination, concluded that defendant should be sentenced to consecutive sentences for the two possession with intent to deliver convictions in this case. In *People v McFarlin*, 389 Mich 557, 574; 208 NW2d 504 (1973), the Supreme Court explained: "The modern view of sentencing is that the sentence should be tailored to the particular circumstances of the case and the offender in an effort to balance both society's need for protection and its interest in maximizing the offender's rehabilitative potential." That is precisely what the trial court did in this case; it looked at defendant's extensive history of criminal conduct and determined that, while defendant's sentence should not exceed the sentencing guidelines recommendation, consecutive sentencing was appropriate. Thus, defendant's argument that the trial court impermissibly considered acquitted conduct is without merit.

## B. SCORING OF OFFENSE VARIABLES

Finally, defendant challenges the scoring of OV 14 and OV 19. Again, we find no error.

We review for clear error the trial court's factual determinations used for sentencing under the sentencing guidelines, facts that must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). We review de novo the trial court's interpretation and application of the statutory sentencing guidelines. *People v Jackson*, 487 Mich 783, 789; 790 NW2d 340 (2010). We will hold the trial court's factual determinations clearly erroneous only if we are left with a definite and firm conviction that the trial court made a mistake. *People v Armstrong*, 305 Mich App 230, 242; 851 NW2d 856 (2014). [*People v Dickinson*, 321 Mich App 1, 20-21; 909 NW2d 24 (2017).]

We first address defendant's argument that OV 14 was improperly scored. OV 14 is governed by MCL 777.44, which provides:

-14-

(1) Offense variable 14 is the offender's role. Score offense variable 14 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) The offender was a leader in a multiple offender situation……………10 points

(b) The offender was not a leader in a multiple offender situation…………0 points

(2) All of the following apply to scoring offense variable 14:

(a) The entire criminal transaction should be considered when scoring this variable.

(b) If 3 or more offenders were involved, more than 1 offender may be determined to have been a leader.

Over objection, defendant was assessed 10 points for OV 14. In responding to defendant's challenge to the scoring of OV 14, the trial court stated:

> All right. Very good. I did, in fact listen to trial testimony in this particular case and from the testimony at trial, it is clear that there were two persons involved, [defendant] and Mr. Kelly. It is also clear from the testimony, that any buy of controlled substances was set up directly with [defendant], not with Mr. Kelly. Mr. Kelly, from the 404B [MRE 404(b)] testimony, as well as from the actions on the date of the offense, was very clearly acting at the direction of [defendant]. And due to that, I believe that it is properly scored at ten points.

We agree, and conclude that the facts elicited at trial fully supported the trial court's determination. In each of the three drug deliveries described by the witnesses, McGrath instigated the delivery by calling defendant. On December 6, the date that formed the basis for the possession with intent to deliver charges, McGrath contacted defendant and asked to buy $40 in heroin. Defendant directed McGrath to go to one location, and then directed him to go to another location where McGrath spotted defendant and picked him up. Defendant directed McGrath to drive around the block and then got out of the car; McGrath drove around the block and then waited by the side of the street. When Kelly approached him and asked what he was doing, McGrath responded that he was waiting for defendant. At that point, Kelly delivered a package of what purported to be heroin, but was not. When defendant was arrested, packets contained between 22 to 28 doses of heroin/fentanyl and eight doses of cocaine were found on his person, as was a digital scale typically used to weigh doses. The manner of conducting the delivery on December 6 was consistent with defendant's manner of conducting the delivery on December 4, when defendant directed McGrath to a location and then Kelly was used as the person who actually delivered the drugs; defendant was observed on December 4 passing something to Kelly before he approached defendant's car. Moreover, there is no testimony that Kelly had any drugs on his person on December 6, but defendant had packets containing multiple doses of both heroin/fentanyl and cocaine, in addition to the digital scales.

Defendant argues that the trial court could not rely on uncharged conduct—the two prior drug sales on November 27 and December 4—but he provides no supporting caselaw. Failure to cite supporting authority constitutes abandonment of the claim. *People v Konopka (On Remand)*, 309 Mich App 345, 366; 869 NW2d 651 (2015). MCL 777.44(2)(a) commands consideration of the entire criminal transaction and here, that involved at least the attempted delivery of heroin and ultimately involved defendant's possession of heroin/fentanyl and cocaine with the intent to deliver. Arguably, the "entire criminal transaction" involved the prior offenses, which established the relationship between McGrath and defendant and demonstrated completed deliveries of illegal controlled substances. But even simply considering the December 6 delivery as a whole, MCL 777.44(2)(a), the trial court could conclude by a preponderance of the evidence that Kelly acted at defendant's direction and was therefore the leader in a multiple-offender situation. Thus, the trial court properly assessed 10 points for OV 14.

Defendant also challenges the scoring of OV 19. MCL 777.49 governs the scoring of OV 19, and provides:

> Offense variable 19 is threat to the security of a penal institution or court or interference with the administration of justice or the rendering of emergency services. Score offense variable 19 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> (a) The offender by his or her conduct threatened the security of a penal institution or court……………………………………………………………………….25 points
>
> (b) The offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice or the rendering of emergency services…………………………………………………………………………15 points
>
> (c) The offender otherwise interfered with or attempted to interfere with the administration of justice, or directly or indirectly violated a personal protection order……………………………………………………………………………….10 points
>
> (d) The offender did not threaten the security of a penal institution or court or interfere with or attempt to interfere with the administration of justice or the rendering of emergency services by force or threat of force………………0 points

In *People v McKewen*, 326 Mich App 342, 358; 926 NW2d 888 (2018), this Court explained:

> "Interfering or attempting to interfere with the administration of justice includes acts that constitute obstruction of justice, but is not limited to such acts." *People v Ericksen*, 288 Mich App 192, 204; 793 NW2d 120 (2010). "OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." [*People v*] *Sours*, 315 Mich App

[346,] 349; 890 NW2d 401 [2016]. See also *People v Barbee*, 470 Mich 283, 288; 681 NW2d 348 (2004) (holding that the act of giving a false name to a police officer constitutes interference with the administration of justice for purposes of OV 19), and *People v Hershey*, 303 Mich App 330, 344; 844 NW2d 127 (2013).

At sentencing, the trial court responded to defendant's challenge to the scoring of OV 19 by stating:

> So, in this particular case, there doesn't need to be an actual interference with the administration of justice, and I would note, for the record, that [defendant] was ultimately, found in the garage. And my memory of the trial testimony is he had controlled substances on his person. The fact of the matter is, the testimony was clear that the raid van, or the ERT van, came around the corner, [defendant] caught notice of that and he, immediately, ran into a garage.

> He was located on the far side of the car. I don't recall whether the testimony was clear as to whether he was hiding under the car or, simply, on the other side of the car. I think that that testimony was vague or speculative at best, but it was clear that he ran from the police into a place that could be perceived as a place of more safety or a place to hide controlled substances that were, ultimately, found on him. So, I find that ten points is properly scored.

In this case, police arrived at defendant's residence to arrest him and to carry out a search pursuant to a judicially-authorized search warrant. Defendant's flight into a garage and his attempt to hide under a vehicle constituted an interference or attempted interference with the administration of justice: the arrest of defendant and the search of his residence pursuant to a judicially-authorized warrant. As this Court pointed out in *Sours*, 315 Mich App at 349, "OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." In this case that was precisely what defendant was trying to do; knowing that he had just participated in a fake drug delivery and that he possessed significant amounts of heroin/fentanyl and cocaine on his person, defendant attempted to flee from the police when he saw them approaching in their ERT van. That defendant finally surrendered without a fight when the police entered the garage (where defendant was essentially trapped because the main garage door was closed and the police were at the small side door) does not change the fact that he was trying to hide and was attempting to interfere with the police arrest of him as well as the search of his residence. Therefore, the trial court did not err by assessing defendant 10 points for OV 19.

Affirmed.

/s/ Jonathan Tukel
/s/ Kathleen Jansen
/s/ Thomas C. Cameron

-17-